IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| **C.M., B/N/F SHAWNA M.** | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **LAKE TRAVIS INDEPENDENT** | § | |
| **SCHOOL DISTRICT** | § | **CIVIL ACTION NO. 1:24-CV-00367-DII** |
| **And** | § | |
| **PAUL NORTON, DEBBIE GARINGER,** | § | |
| **SANDRA SURDY, and** | § | |
| **HENRY "HANK" CARTER,** | § | |
| **in their Individual Capacities,** | § | |
| **Defendants.** | § | **JURY DEMAND** |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

C.M. b/n/f Shawna M. ("Plaintiff"), files this First Amended Complaint against Lake Travis Independent School District and Paul Norton ("Norton"), Debbie Garinger ("Garinger"), Sandra Surdy ("Surdy"), and Henry "Hank" Carter ("Carter") (collectively "Administrative Defendants"), and would show the court as follows:

## I.      INTRODUCTION

1.      C.M., a former student and football player at Lake Travis High School, endured persistent disability-based harassment, bullying, and assaults from teammates due to his life-threatening peanut allergies, with one perpetrator even referring to the actions as "attempted murder." Despite C.M.'s efforts to seek help from school authorities, LTISD was deliberately indifferent to the ongoing bullying, failing to intervene or provide accommodations, properly supervise students, and staff, or enforce disciplinary measures mandated by state law for students committing assault. This failure to address the ongoing bullying not only violated C.M.'s rights but also endangered his life. Despite attempts to involve school officials, the harassment continued,

leading C.M. to transfer to another district for his safety. LTISD's action and inaction created a hostile environment and exacerbated the situation, demonstrating deliberate discrimination against C.M. and causing him harm.

## II.   JURISDICTION

2.      Jurisdiction is claimed under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq., Section 504 of the Rehabilitation Act ("Section 504" or "RA"), 42 U.S.C. §§ 12101 et. seq., and 42 U.S.C. § 1983, and under the Constitution of the United States.

## III.   VENUE

3.      Venue is predicated upon 28 U.S.C. § 1391(b)(1) based upon the residence of the Plaintiff and Defendants and upon 28 U.S.C. § 1391(b)(2) because the events, acts, and omissions giving rise to Plaintiffs' claims occurred within this District.

## IV.   PARTIES

4.      C.M. is a minor individual who has life-threatening allergies and asthma. C.M. is therefore qualified as a person with a disability as defined by Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act 34 C.F.R. § 104.3(l).

5.      C.M. resides with his parents in Travis County and attended school in Lake Travis Independent School District. C.M.'s parent and next friend, S.M., brings this action on his behalf.

6.      Lake Travis Independent School District (LTISD) is a public entity as defined by 42 U.S.C. § 12131, Section 201 of the ADA, and Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, and the regulations promulgated thereunder, which prohibit discrimination and retaliation against persons with disabilities.

7.      LTISD is and has been at all relevant times the recipient of federal financial assistance, and that part of that financial assistance has been used to fund the operations,

construction and/or maintenance of the specific public facilities described herein and the activities that take place therein.

8.      LTISD, among other things, violated § 504 of the Rehabilitation Act, and the ADA as amended.

9.      LTISD failed in its duty under Texas Education Code section 38.0151 to adopt and administer a policy for the care of students with diagnosed food allergies at risk for anaphylaxis, which caused C.M. harm.

10.     LTISD discriminated against C.M. and denied him of educational benefits including by failing to accommodate his disability and by creating a hostile educational environment.

11.     Administrative Defendants deprived C.M. of his Federal and State Constitutional rights; and denying C.M. of the benefits, immunities, entitlements, services, and assistance otherwise afforded to nondisabled students.

12.     All of the defendants further deprived C.M. of his Federal and State Constitutional rights and the benefits, immunities, entitlements, services, and assistance otherwise afforded to non-disabled students.

13.     All of the defendants' actions and failures as described herein fostered, created, and perpetuated educational disability harassment and a hostile educational environment.

A.      **Individual Administrator Defendants**

14.     Paul Norton is the Superintendent of Schools for the LTISD. Plaintiff is informed and believes that at all times mentioned herein, Norton was and continues to be the Superintendent of Schools for the LTISD and among other things, is responsible for supervising, monitoring,

administering, and implementing educational policies and programs for students including those with disabilities.

15.    Plaintiff is informed and believes that at all times mentioned herein Norton, among other things, was and continues to be responsible for supervising, monitoring, administering, and implementing state and federal law and LTISD policy regarding students with disabilities, bullying and harassment, and student discipline.

16.    Plaintiff is informed and believes that at all times mentioned herein, Norton is also responsible for supervising, monitoring, administering, and implementing policies and state and federal law regarding food allergies and for the training, supervision, and discipline of LTISD administrators, teachers, and students.

17.    Debbie Garinger is the principal at Lake Travis High School (LTHS). Plaintiff is informed and believes that at all times mentioned herein, Garinger, among other things, is responsible for supervising, monitoring, administering, and implementing educational programs, including educational programs for students with disabilities; policies and state and federal law regarding teacher training, food allergies, bullying and harassment, and training and discipline of LTHS administrators, teachers, and students.

18.    Plaintiff is informed and believes that at all times mentioned herein, Sandra Surdy was and continues to be the Assistant Principal of Lake Travis High School and among other things, is responsible for support of training, supervising, monitoring, administering, and implementing educational programs, including educational programs for students with disabilities; implementing policies and state law regarding food allergies, bullying and harassment, and the discipline of teachers and students.

19.     Plaintiff is informed and believes that at all times mentioned herein Norton, Garinger, and Surdy were and continue to be responsible for the training, supervision, discipline, and monitoring of LTHS teachers and staff.

20.     Hank Carter is the LTISD Director of Athletics and Lake Travis High School Head Football Coach and teacher and at all times mentioned herein was and continues to be an LTISD administrator and the employee and agent of LTISD who, among other things, was responsible for supervising, monitoring, administering, and implementing student discipline, and student programming in accordance with state and federal law and LTISD policy.

21.     Plaintiff alleges that at all times mentioned herein, Norton, Garinger, Surdy, and Carter violated state and federal law and LTISD policy and have created, established, encouraged, enforced, ratified, supported, aided, implemented, and administered a custom of practice and usage of disability-based peer harassment and bullying with act or omission, which, among other things:

(a)     abdicated their duty to implement and enforce disciplinary law, policy, and consequences in response to disability-based peer bullying and harassment;

(b)     failed to supervise, enforce, and administer educational programs to prevent and take corrective and disciplinary actions for disability-based harassment and bullying;

(c)     abdicated their duty and care to administer, implement, and establish a program for disabled students, such as C.M., free of oppression, and physical and emotional abuse;

(d)     deprived C.M. of an effective program of prevention, intervention, reporting, investigation, and discipline of incidents of disability-based harassment and bullying; and

(e)     abdicated their duty and care to administer, implement, and establish a student safety and food allergy program for students, including for C.M.;

(f)     abdicated their duty and care to implement an educational environment supporting the peaceful enjoyment, life and liberty, and educational opportunity for its students with disabilities, such as C.M

(g)     deprived C.M. of his Federal and State Constitutional rights; the peaceful enjoyment of his education; benefits, immunities, entitlements, services, and assistance otherwise afforded to nondisabled students; and

(h)     deprived C.M. of an effective program of prevention, intervention, reporting, investigation, and discipline of incidents of disability based harassment and bullying; and

(i)     abdicated their statutory duty to enforce the laws and LTISD policy protecting students with disabilities from harassment and bullying.

22.     All of the acts of Norton, Garinger, Surdy, and Carter were done, and are continuing to be done, under the color and pretense of state and federal law, including the ordinances, regulations, customs, policies, and usages of LTISD.

23.     Plaintiff is informed and believes that at all times mentioned herein LTISD, Norton, Garinger, Surdy, and Carter had the knowledge, capability, authority, and jurisdiction of the wrongs committed against C.M. that were done or that were to be done, and had the power, knowledge, capability, authority, and jurisdiction to stop, prevent, and correct the commission of wrongs, neglected, refused, avoided, and/or did not act to do so.

24.     LTISD, its officers, agents, servants, employees, or persons acting at their behest or direction, denied C.M., among other things, disability accommodations, equal access to

education, an environment free from violence and reprisal, and an education specifically geared toward C.M.'s needs as a student with a disability.

25.     Defendants have, and are, acting in conscious disregard, deliberate indifference, and/or gross misjudgment and in bad faith as to the rights of the Plaintiff, creating educational harassment and a hostile environment, as herein alleged.

26.     Plaintiff alleges that at all times mentioned herein, the acts and omissions of the defendants LTISD, Norton, Garinger, Surdy, and Carter ratified the conduct, acts, omissions, policies, and practices of each individual defendant and LTISD who, among other things, discriminated against C.M. and denied him of educational benefit including by failing to accommodate his disability; deprived him of his Federal and State Constitutional rights; and denied C.M. of the benefits, immunities, entitlements, services, and assistance otherwise afforded to nondisabled students.

## V.     SUMMARY OF FACTS

### A.     THE 2022/23 SCHOOL YEAR

27.     During the 2023/24 school, C.M. was a sophomore student and on the football team at Lake Travis High School (LTHS) in the Lake Travis Independent School District (LTISD).

28.     C.M. has severe allergies to peanuts, tree nuts, and shellfish, which significantly limit his ability to engage in major life activities such as breathing and respiratory function. Exposure to these substances can trigger anaphylaxis, a severe and potentially life-threatening allergic reaction. C.M. also has asthma which exacerbates his reactions to allergens.

29.     LTISD was aware of C.M.'s severe allergies. In the fall of 2022, during C.M.'s freshman year at LTHS, C.M. had a severe allergic reaction to a cookie he purchased from the LTHS school cafeteria. Notably, the allergy "system" in place at LTHS expressly stated the cookie

C.M. purchased did not contain nuts. However, after C.M. ate the cookie, C.M.'s airway immediately began to close. He was able to make it to the nurse's office where LTISD administered epinephrine and called for emergency assistance. On route to the emergency room via ambulance, C.M. had to be administered another dose of epinephrine. After subsequent administration of life-saving medication and treatment at the hospital, C.M. was ultimately released. However, over the next several days, C.M.'s body continued to negatively react to the nuts contained in the cookie provided to C.M. by LTHS.

30.     Remarkably, following the incident, the school neglected to inquire about C.M.'s well-being or discuss future safety measures or accommodations to prevent similar life-threatening incidents. Instead, it was C.M.'s mother who reached out to various school authorities, including the principal, assistant principal, school nurse, and nutrition manager. Despite these efforts, the school failed to initiate a Section 504 evaluation or provide any accommodations for C.M.'s disability.

31.     The Texas Education Code requires the board of trustees of each school district to adopt and administer a policy for the care of students with diagnosed food allergies at risk for anaphylaxis based on the guidelines developed by the legislated Ad-Hoc committee. TEX. EDUC. CODE § 38.0151. The board of trustees is required to review its policies yearly and revise the policies when necessary. TEX. EDUC. CODE § 38.0151 (b).

32.     Prior to the LTISD's Board of Trustees meeting on February 21, 2024, LTISD had not reviewed or updated its food allergy policies since 2020. This lack of review and update caused or contributed to C.M. being provided with a food product containing nuts, which endangered his health and safety given his severe food allergies.

**B.**     **THE 2023/2024 SCHOOL YEAR**

33.     Just prior to the start of the 2023/24 school year, on August 14, 2023, C.M.'s physician completed an updated food allergy action form again stating C.M. is allergic to peanuts, tree nuts, and shellfish. The physician also noted that C.M. has asthma and is consequently at "higher risk for a severe [allergic] reaction." C.M.'s parent provided the form to LTHS at the beginning of the school year. LTISD failed to initiate a Section 504 evaluation or provide any accommodations for C.M.'s disability.

34.     On October 5, 2023, C.M. and several teammates, including Student B. and Student G., were discussing where to stop for dinner after school. When Texas Roadhouse was proposed as an option, C.M. disclosed that he could not go to a place known for serving peanuts due to his severe allergy to peanuts. Student G. and Student B. directly questioned C.M. about the severity of his peanut allergy, asking if certain actions could potentially kill him. They inquired whether throwing peanuts on him, pouring them in his locker, or putting them in his uniform could be fatal. C.M. candidly responded that any of these actions could indeed result in his death and even showed his teammates the epi-pen he always carries as a precaution.

35.     Unbeknownst to C.M., Student G. and Student B. would later carry out all three of these inquiries. Within minutes of the conversation about C.M.'s allergies ending, Student G. and Student B. returned to LTHS and unlawfully entered the varsity football locker room. Student G. procured a can of peanuts from a teammate's locker and proceeded to empty the contents all over C.M.'s uniform and inside his football cleats. Additionally, Student G. scattered peanuts throughout C.M.'s locker for maximum exposure. Student B. recorded this dangerous act on his phone. The following morning, Student B. attempted to clean out the peanuts from C.M.'s locker by emptying the cleats, but the harm had already been done.

36.     On October 6, 2023, the day after the students' discussion about C.M.'s peanut allergy, the team gathered at LTHS to prepare for the game and board the bus. During this time, Student G. initiated an attack by throwing peanuts at C.M. Fortunately, C.M. managed to avoid the assault and proceeded toward his athletic locker. On his way there, he witnessed Student B. showing his phone to other teammates, laughing, and mentioning something about what they had done to C.M. Although C.M. was not yet aware of the specifics, he would soon learn of the actions taken by Student G. and Student B. against him.

37.     Upon arriving at his locker, C.M. discovered peanuts strewn across the ground. When he retrieved his uniform, he found it, along with his cleats, covered in peanuts, which triggered an allergic reaction. C.M.'s coach provided him with a clean jersey and cleats for the football game. Since C.M. did not ingest the peanuts or wear the contaminated uniform, he did not require emergency medical treatment, although he had hives on his arm for several days. Despite Student G.'s and Student B.'s deliberate actions in placing peanuts in C.M.'s locker and recording the assault, neither faced any disciplinary consequences for their premeditated and life-threatening attacks against C.M.

38.     The following day, C.M.'s parent raised concerns with LTHS head football coach, Hank Carter, regarding the life-threatening bullying by teammates Student G. and Student B. However, she received no substantial response from Coach Carter apart from assurances that he would "handle the situation". However, Coach Carter is not a school administrator and does not have the authority to implement disciplinary consequences such as suspension or removal to a Disciplinary Alternative Education Program (DAEP). Failing to find a resolution, on October 11, 2023, C.M.'s mother met with Assistant Principal Surdy, who stated that any disciplinary actions would be handled by Coach Carter.

39.     The Texas Education Code specifically mandates that school districts prohibit bullying and harassment and that school districts ensure that its employees enforce those prohibitions. TEX. EDUC. CODE § 37.001(7).

40.     LTISD's FFI (Local) policy outlines the following procedures regarding allegations of bullying:

a.     When an allegation of bullying is reported, the principal or designee shall notify a parent of the alleged victim on or before the third business day after the incident is reported. The principal or designee shall also notify a parent of the student alleged to have engaged in the conduct within a reasonable amount of time after the incident is reported.

b.     The principal or designee shall determine whether the allegations in the report, if proven, would constitute prohibited conduct as defined by policy FFH, including dating violence and harassment or discrimination on the basis of race, color, religion, sex, gender, national origin, or disability. If so, the District shall proceed under policy FFH. If the allegations could constitute both prohibited conduct and bullying, the investigation under FFH shall include a determination on each type of conduct.

c.     The principal or designee shall conduct an appropriate investigation based on the allegations in the report. The principal or designee shall promptly take interim action calculated to prevent bullying during the course of an investigation, if appropriate.

41.     Texas Education Code Section 37.083 also requires public schools to implement a discipline management program that includes prevention and education concerning unwanted physical or verbal aggression, sexual harassment, and other forms of bullying at school.

42.     Under Texas Education Code section 37.006, Student G. was also required to be placed in the Disciplinary Alternative Education Program for his assault against C.M., which contains the elements of assault under Section 22.01(a)(1), Texas Penal Code. LTISD's policy mirrors this requirement:

FOC — Student Discipline: Placement in a Disciplinary Alternative Education Setting

A student shall also be removed from class and placed in a DAEP if the student commits the following on or within 300 feet of school property, as measured from any

11

point on the school's real property boundary line, or while attending a school-sponsored or school-related activity on or off school property:

1. Engages in conduct punishable as a felony.

   Engages in conduct that contains the elements of assault, under Penal Code 22.01(a)(1).

43.     The elements of assault under Section 22.01 of the Penal Code require that an individual (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative. LTISD was thus required to place Student G, LTISD's football "star" in a DAEP, and by intentionally failing to do so, LTISD was deliberately indifferent to the rights of C.M.

44.     LTISD intentionally deviated from its established disciplinary practices, policies, and state law despite C.M. sustaining bodily injury when Student G deliberately, knowingly, or recklessly placed peanuts in C.M.'s athletic locker and subsequently threw peanuts at him. LTISD failed to take any action to prevent bullying against C.M. and neglected to ensure its employees enforced prohibitions against bullying and harassment.

45.     Undeterred by LTISD's lack of response, Student G has continued to boast about what he refers to as his "attempted murder" of C.M. He has escalated his threatening verbal assaults against C.M., boasting that he is a "killer" who would prevail against any charges brought against him by C.M. or his family.

46.     On October 27, 2023, C.M.'s mother sent a text message to Coach Carter detailing how Student G constantly taunted C.M. and boasted about being untouchable, even daring C.M. to press charges. Student G also expressed a desire to harm C.M. during practice and bragged about

being a "killer" both on and off the field. Despite these concerns raised by C.M.'s mother, no disciplinary action was taken against the perpetrators as required by LTISD's policy and State law. Additionally, LTISD failed to implement any measures to prevent further bullying.

47.     On October 30, 2023, another student placed a peanut butter granola bar in C.M.'s backpack, further endangering him due to his severe peanut allergy. Additionally, C.M. was repeatedly removed from the team's group chat. Coach Carter addressed the incidents vaguely, referring to them as "the shit going around our community" and suggesting the team should just "let it die." During Coach Carter's speech, Student G directed threatening gestures toward C.M. by shaking his head. However, no action was taken by LTISD to prevent further bullying, and Student G faced no consequences for his behavior.

48.     While Coach Carter seemed more concerned about the community's perception regarding the team's conduct, C.M.'s mother was deeply worried about her son's safety and well-being due to Student G.'s persistent bullying, harassment, and assaults. Despite C.M.'s mother's efforts, including a meeting with Paul Norton, the superintendent of LTISD, on November 8, 2023, the school district failed to address the ongoing bullying issues faced by C.M.

49.     Despite C.M. discussing his desire to quit the football team due to bullying and harassment with his coaches, including Coach Carter, no action was taken to prevent bullying. In a post-game interview on November 11, 2023, Coach Carter expressed gratitude for various entities but acknowledged the troubling events happening outside the lines at Lake Travis. However, no measures were implemented by LTISD to address the bullying issues, which Coach Carter referred to as "crap."

50.     C.M.'s parent, frustrated by LTISD's lack of response to ongoing bullying incidents, addressed the November LTISD Board of Trustees meeting out of concern for C.M.'s

safety. Following this, LTISD acknowledged that two students placed peanut products on C.M.'s belongings but attempted to minimize the severity of the assault by noting that peanut butter was not spread on any equipment.

## C.   THE BULLYING INVESTIGATION

51.     Following the parent's address to the Board and prolonged bullying against C.M., LTISD initiated a bullying investigation. However, on March 4, 2024, Assistant Principal Sandy Surdy provided the plaintiff with the purported "bullying investigation" report. Surdy not only failed to promptly take interim action to prevent bullying during the investigation but also investigated and produced a report that fell well short of LTISD's policy standards for appropriateness.

52.     Despite LTISD's indication of compliance with the Education Code's requirement to review its food allergy policies and provide training, it failed to address training or support for the enforcement of discipline policies related to bullying and harassment, particularly those concerning bullying due to disability. Surdy's report began with the assertion, "Based on my investigation, I conclude that bullying, as defined by law and LTISD policy, has not occurred." This conclusion seemed to rely on C.M.'s alleged lack of desire for a schedule change or expressed fear of attending school. However, Surdy's report overlooked crucial details, including C.M.'s expressed desire to quit the football team due to relentless bullying and his eventual transfer to another school district to escape the harassment and life-threatening assaults. Despite this, Surdy did acknowledge that C.M. had been adversely affected by the events of October 6 and subsequent bullying incidents, resulting in a school environment that was "not entirely positive."

53.     While Surdy acknowledged that C.M.'s school environment was "not entirely positive" as a result of the bullying, the extent of her response, however, was to refrain from

disciplining Student G. as State law and LTISD's policy mandated. Instead, Student G. was merely "counseled" about expectations under LTISD's Code of Conduct despite that Student G., and all students enrolled in LTISD, are required to acknowledge these expectations at the beginning of each school year. Additionally, Surdy reported Student G. was "directed" to stay away from C.M. But despite being directed to stay away from C.M., Student G., and C.M. remained on the same football team and had at least one class together, undermining the effectiveness of this directive. Even after "counseling" the offender on the student code of conduct and "directing" him to avoid C.M. produced no results, Surdy failed to employ any other method to address the ongoing bullying, cyberbullying, and harassment.

54.     The report further stated that the football coaching staff had been involved in the investigation and expressed their commitment to not only monitoring the situation between C.M. and Student G. but also to fostering a positive environment on the team free of bullying or retaliation. However, despite this assurance, LTISD took no significant action beyond the minimal response to the harassment complaints, even after months of ongoing abuse and it was not free from bullying or retaliation.

55.     Additionally, Surdy's erroneous conclusion stating that "bullying, as defined by law and LTISD, has not occurred" simply contradicts the legal definition of bullying. The Texas Education Code defines bullying as a "single significant act or a pattern of acts by one or more students directed at another student that exploits an imbalance of power and involves engaging in written or verbal expression, expression through electronic means, or physical conduct . . . that:

    **(i)**    has the effect or will have the effect of physically harming a student, damaging a student's property, or placing a student in reasonable fear of harm to the student's person or of damage to the student's property;

    **(ii)**    is sufficiently severe, persistent, or pervasive enough that the action or threat creates an intimidating, threatening, or abusive educational environment for a student;

    **(iii)**    materially and substantially disrupts the educational process or the orderly operation of a classroom or school; ***or***

    **(iv)**    infringes on the rights of the victim at school; and

    **(**B) includes cyberbullying."

TEX. EDUC. CODE § 37.0832 (emphasis added). LTISD's FFI (Legal) policy adopts the Education Code's definition. There can be no serious dispute that C.M. was bullied, physically harmed, and was in reasonable fear for his safety or that his educational process was disrupted and that C.M.'s rights at school were infringed upon.

56.    Surdy's report also failed to address the numerous instances of cyberbullying directed at C.M. For example, students from LTHS posted derogatory comments about C.M. and his family on social media platforms. On an Instagram account run by LTISD student-athletes, "ltlakehouse", a user named "peanutbutterclub123" made comments such as "maybe stop worrying about the peanuts and worry about getting on that treadmill," referencing C.M.'s family member's alleged weight. "Peanutbutterclub123" also suggested taking "the fork and knife away from her" in another comment. Another user, "west.lake20," suggested involving the news in the "chocolate syrup situation" because the person could have had a severe allergic reaction. Furthermore, a user named "my_allergy_could_kill_me" posted several derogatory comments, including one directed at C.M.'s family member, stating "y'all are some soft kids, grow up." Moreover, the operator of the "ltlakehouse" account posted, "MORE LIKE 10-1 YOU [expletive] . . . [expletive] THE PEANUTS . . . WE ARE BACK MOTHERF***ERS."

57.    Instead of acting on pervasive bullying against C.M., LTISD further violated its own policies and retaliated against C.M. LTISD only offered to change C.M.'s schedule to move him away from Student G. Consequently, in March 2024, after enduring six months of assault, harassment, and bullying based on his disability, C.M. ultimately transferred to another school

district to escape the harassment. But, because the harassment continues to escalate, C.M.'s parents are now selling their family home and moving outside of LTISD's attendance boundaries.

### D.   THE MARCH BOARD MEETING AND THE AFTERMATH

58.     As more media attention was given to LTISD's failure to act, on March 20, 2024, several individuals addressed the LTISD Board of Trustees, with some implying that C.M. and his parent were lying about the incident. A couple of football players told the board that they never observed any bullying of C.M. Despite this, all individuals acknowledged that peanuts were placed in C.M.'s locker by Student G. with the intent to harm him, resulting in C.M. having an allergic reaction. Despite Student G.'s mother stating that he apologized to C.M., Student G. remains undeterred due to the lack of action by LTISD, continuing to bully and harass C.M. based on his disability. By way of example of the ongoing cyberbullying by LTISD students against C.M. based on his disability, in March 2024, C.M. announced on Twitter that he was transferring from LTISD to Leander ISD and Vandegrift High School ("VHS"). Student G "liked" C.M.'s message announcing C.M.'s departure.[1]

59.     On the same day, the Instagram account "var_austin" posted a message announcing C.M.'s transfer to VHS. Var_austin, with 82,000 followers, regularly shares updates about Austin-area varsity sports. Among the comments on this post, a user named "msmellielew" wrote, "LT be running kids off bc little rich kids get away with attempted murder ON CAMPUS!" As of March 13, 2024, Student G. "liked" msmellielew's comment. Essentially, Student G. is openly displaying on social media that he faced no consequences for an attempted murder. Despite this, LTISD has not taken any action in response to these social media posts, including those where Student G. "liked" a reference to his attempted murder of C.M.

---

[1] Social media postings have a way of disappearing. To this end, Plaintiffs have taken steps to document the relevant evidence in the event this information gets deleted.

60.     On March 25, 2024, the Instagram account "ltlakehouse" posted a picture of Student G. with the location tagged as "Jif Peanut Butter Plant." The accompanying message expressed stated, "[expletive] ThE pEaNuTs YaLl ThOuGhT yAlL cOuLd StOp Us." This post received approximately 650 likes, including from LTISD football players, students, community members, and even Student G.'s mother. The post was also liked by one of the football players who told the Board of Trustees that he did not observe any bullying of C.M. Other comments on the post included "[expletive] a peanut," "peanut boy going all the way," and a picture of spreading peanut butter on bread.

61.     On March 27, 2024, LTISD student users of the Instagram account "ltlakehouse" discovered a Facebook posting that was complaining about "ltlakehouse" and the offensive bullying and harassment pertaining to C.M. In response, the LTISD students, using the "ltlakehouse" account posted "Ts is honestly ridiculous🤣 Lakeway stay at home moms will find anything that they can bitch about🙄 if your parents are in this group they are all liberal karens that need to get a life and stop spamming about all this shit because ain't no body gon stop us🤣." The "ltlakehouse" account again posted their location as "Jif Peanut Butter Plant." Another student commented, "it's insane that you guys are continuously joking about ATTEMPTED MURDER." This comment was ridiculed by one of the football players who told the Board of Trustees he never observed any bullying of C.M.

62.     Student G. and Student B. intentionally, recklessly, and knowingly placed harmful products in C.M.'s personal items with the intent to cause injury—and recorded the assault. LTISD and the individual defendants were deliberately indifferent to C.M.'s rights by, *inter alia*, disregarding the assaults by Student G. and downplaying the severity of his ongoing actions, which constitutes bullying under Chapter 37 of the Texas Education Code. LTISD and the individual

defendants failed to take appropriate actions to address the bullying and harassment based on C.M.'s disability knowing it was interfering with C.M.'s ability to participate in school activities.

63.     Despite LTISD's erroneous "conclusion" that Student G.'s conduct did not meet the definition of bullying, there can be no serious doubt that Student G.'s actions constituted physical conduct that (1) physically harmed C.M., (2) created an intimidating, threatening, and abusive educational environment for C.M., and (3) materially infringed on the C.M.'s rights at school. The defendants' actions after the incident further constituted written or verbal expression that (1) created an intimidating, threatening, and abusive educational environment for C.M., and (2) materially infringed on C.M.'s rights at school. Even after C.M.'s departure, the harassing conduct by LTISD's students continues. There have been no actions by LTISD to address the bullying behavior on social media.

64.     Under Section 504 and Title II, schools are mandated to address bullying and harassment based on a student's disability, particularly if it interferes with the student's ability to participate in school activities. C.M. endured severe disability-based physical and verbal intimidation and abuse, which was well-known among school staff and administrators. Despite C.M. and his mother's efforts to address the issue, LTISD failed to take appropriate action, leaving C.M. vulnerable to further attacks. The pervasive bullying significantly impacted C.M.'s school experience, leading him to believe that transferring to another district was his only option to escape the harassment. LTISD neglected its duty by ignoring the bullying, failing to train its staff, inadequately supervising the situation, and neglecting established policies for addressing and disciplining bullies. As a result, C.M., a student with a life-threatening disability, suffered significant harm. Plaintiffs therefore bring this action to correct LTISD's unlawful conduct.

## VI.    First Cause of Action (LTISD)
### Violations of Title II of the Americans with Disabilities Act
### 42 U.S.C. §§ 12101 *et seq.* ("ADA")

65.    Plaintiff repeats and re-alleges the allegations in previous paragraphs of this Complaint as if fully alleged herein.

66.    Defendant LTISD, because of C.M.'s disability, excluded C.M. from participation in, denied the benefits of, and subjected C.M. to discrimination under any program or activity receiving Federal financial assistance, contrary to 29 U.S.C. § 794.67.

67.    The ADA provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities. 42 U.S.C. §§ 12101(b)(1) & (2). Enactment of the ADA reflected deeply held American ideals that treasure the contributions that individuals can make when free from arbitrary, unjust, or outmoded societal attitudes and practices that prevent the realization of their full potential. The ADA embodies a public policy committed to the removal of a broad range of impediments to the integration of people with disabilities into society and strengthening the federal government's role in enforcing the standards established by Congress.

68.    Title II, Subpart A of the ADA prohibits discrimination by any "public entity," including any state or local government, as defined by 42 USC § 12131, section 201 of the ADA Pursuant to 42 USC §12132, Section 202 of Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity."

69.    Under the ADA, an individual with a disability is a person who has a physical or mental impairment that substantially limits major life activities; has a record of such an impairment; or is regarded as having such an impairment. Major life activities include functions

such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

70.    C.M. was at all times relevant herein had severe food allergies and asthma, which substantially limited his major life activities of breathing and respiratory function, and as such, is a qualified individual with a disability entitled to the protections of the "Public Services" provision of Title II of the Americans with Disabilities Act, as amended.

71.    C.M. was denied the benefits of services, programs, or activities for which LTISD is responsible or was otherwise discriminated against by LTISD, and such discrimination is by reason of C.M.'s disability.

72.    LTISD, with deliberate indifference, bad faith, or gross professional misjudgment, discriminated against C.M. in violation of the ADA and its implementing regulations. By its actions and inaction, LTISD has failed in its responsibilities under Title II to accommodate C.M.'s disability, provide its services, programs, and activities in a full and equal manner to disabled persons as described hereinabove, including by failing to ensure that educational services are provided on an equal basis to C.M., a student with a disability.

73.    LTISD further failed to appropriately address the disability-based harassment against C.M. in compliance with State law and its own policy, which deprived C.M. of a public education. By its actions and inaction, LTISD has further failed in its responsibilities under Title II to provide its services, programs, and activities in a full and equal manner to disabled persons as described hereinabove by subjecting C.M. to an educational environment that was hostile toward his disability.

74.    The training and supervision of staff, and the supervision, discipline, and admonishment of students regarding peer disability-based harassment by LTISD were at all times

relevant to this action but inadequate to the tasks that LTISD had to perform; the inadequacy is the result of LTISD's deliberate indifference, and the inadequacy is and was at all times mentioned herein in some manner closely related to or actually caused C.M. deprivations and injuries as stated herein.

75.     A direct and proximate result of LTISD's failure to comply with their duties under the ADA, C.M. has suffered damages including compensatory, special, and general damages according to proof.

**VII.     Second Cause of Action (LTISD)**
**Violations of Section 504 of the Rehabilitation Act of 1973**
**29 U.S.C. §§ 701, 705, 794 and 794a ("Section 504")**

76.     Plaintiff repeats and re-alleges the allegations in previous paragraphs of this Complaint as if fully alleged herein.

77.     Defendant LTISD, because of C.M.'s disability, excluded C.M. from participation in, denied the benefits of, and subjected C.M. to discrimination and harassment under Section 504, contrary to 42 U.S.C. § 12131, *et seq*.

78.     Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794 ("Section 504" or "RA"), and the regulations promulgated thereunder, prohibit discrimination against persons with disabilities. Section 504 prohibits the exclusion from participation in, or being denied the benefits of, or being subjected to discrimination under, any program or activity receiving Federal financial assistance.

79.     Under Section 504, a "handicapped person" is defined as "any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. 34 C.F.R. § 104.3(j). Section 504 encompasses a life-threatening food allergy.

80.     At all times relevant, C.M.'s food allergies and asthma substantially limit the major life activities of breathing and respiratory function, and therefore, C.M. is an individual with disabilities that substantially limit one or more major life activities and is considered to be a person with a disability under Section 504 of the Rehabilitation Act, as amended. *See* 29 U.S.C. § 705(9)(B), as amended by the ADA Amendments Act, Pub. L. 110-325, Sec. 7, 122 Stat. 3553 (Sept. 25, 2008).

81.     LTISD, with deliberate indifference, bad faith, or gross misjudgment, refused to accommodate C.M.'s disability.

82.     LTISD intentionally or with bad faith or gross misjudgment, violated Section 504 because the disability-based peer harassment of C.M. was sufficiently serious that it created a hostile environment, denying or decreasing C.M.'s ability to benefit from his education, and such harassment was encouraged, tolerated, not adequately addressed, or ignored by LTISD.

83.     As a direct and proximate result of LTISD's failure to comply with their duties under Section 504 of the RA, C.M. has suffered damages including compensatory, special, and general damages according to proof.

### VIII.   Third Cause of Action
### Violations of Section 504 of the Rehabilitation Act
### 34 C.F.R. § 104.33(a)

84.     Plaintiff repeats and re-alleges the allegations in previous paragraphs of this Complaint as if fully alleged herein.

85.     Section 504 requires schools to provide a free and appropriate public education to all students with disabilities within its jurisdiction.  LTISD failed to comply with the requirements to provide a free and appropriate public education under Section 504 by failing to evaluate C.M. and provide individualized accommodations.

### IX.   Fourth Cause of Action
**(LTISD & Norton, Garinger, Surdy, and Carter, in their Individual Capacities)**
**42 U.S.C. § 1983 Equal Protection Violation Under the Fourteenth Amendment**

86.     Plaintiff repeats and re-alleges the allegations in previous paragraphs of this Complaint as if fully alleged herein.

87.     LTISD, while acting under color of law, subjected, or caused to be subjected, C.M. to be deprived of any rights, privileges, or immunities, contrary to 42 U.S.C. § 1983.

88.     LTISD, through its employees/agents and its policies, enabled and intentionally caused C.M. to be discriminated against based on his disability.

89.     The Administrative Defendants, while acting under color of law, subjected, or caused to be subjected, C.M. to be deprived of his rights, privileges, or immunities, contrary to 42 U.S.C. § 1983. The Administrative Defendants intentionally caused C.M. to be discriminated against based on his disability.

90.     It is unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority to engage in a pattern or practice of conduct by officials or employees of the governmental authority with responsibility for the administration implementation, supervision, and education of disabled students that deprives persons of rights or privileges secured or protected by the Constitution or laws of the United States.

91.     The equal protection clause of the 14th Amendment requires that when a state establishes a public school system, no child living in that state may be denied equal access to education. The Texas Constitution provides, "[a] general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient

system of public free schools." Tex. Const. 7, § 1. State law requires schoolchildren to attend school each day that instruction is provided. TEX. EDUC. CODE § 25.085.

92.     The actions or inactions described herein of LTISD and the individual defendants in response to complaints of student-to-student anti-disability harassment, performed under color of state law, deprived C.M. of equal protection, and caused C.M. to have to leave LTISD altogether.

93.     LTISD and the Administrative Defendants, through its agents/employees, are liable to C.M. for excluding C.M. from activities, denying his benefits, and subjecting him to intentional discrimination.

## X.     Fifth Cause of Action (LTISD)
### Section 1983 § Failure to Train and Supervise

94.     Plaintiff repeats and re-alleges the allegations in previous paragraphs of this Complaint as if fully alleged herein.

95.     LTISD, through its employees/agents and its policies, enabled and intentionally caused Chase to be discriminated against based on his disability.

96.     The response of LTISD to the disability-based harassment departed from federal and state law as well as LTISD's established policy, custom, or practice for addressing bullying and harassment and ensuring the safety of students who have life-threatening food allergies.

97.     LTISD inadequately communicated anti-harassment policies to students, administrators, and staff despite LTISD's awareness of hostility toward C.M. based on his disability. LTISD's training policy procedures were inadequate, and LTISD was deliberately indifferent in adopting its training policy and the inadequate training policy directly caused the constitutional violation.

98.     LTISD's school officials' deliberate indifference to the disability-based peer harassment against C.M. represented LITSD's policy, custom, or practice, or that officials' response to the peer harassment departed from Federal and State law as well as LTISD's established policy, custom, or practice for addressing disability-based bullying and harassment.

99.     LTISD, with deliberate indifference to the known or obvious consequences of its actions or inactions, failed to adequately train and supervise its administrators, teachers, students, and coaches about LTISD's policies prohibiting bullying and harassment on the basis of disability. The inadequate training of administrators and staff resulted in a hostile educational environment for C.M. and the hostile environment was allowed to continue. There was an obvious need for training and the discrimination C.M. faced was a highly predictable consequence of LTISD not providing that training and supervision. LTISD denied C.M. equal access to educational opportunities and consequently, C.M. had to leave LTISD.

100.     LTISD inadequately communicated its food allergy policies to administrators, staff, and students despite the known or obvious consequences of its actions or inactions, about LTISD's policies prohibiting bullying and harassment on the basis of disability, and LTISD was deliberately indifferent in adopting its training policy and the inadequate training policy directly caused the constitutional violation. There was an obvious need for training and the discrimination C.M. faced was a highly predictable consequence of LTISD not providing that training and supervision.

101.     LTISD's deliberate indifference to the needs of students with diagnosed food allergies at risk of anaphylaxis represented LITSD's policy, custom, or practice, or that officials' response which departed from Federal and State law as well as LTISD's established policy, custom, or practice for addressing food allergies and anaphylaxis.

102.    LTISD, with deliberate indifference to the known or obvious consequences of its actions or inactions, failed to adequately train or supervise its administrative and teaching staff. Despite being aware of the risks of constitutional violations, LTISD chose not to implement reasonable measures to prevent such violations through proper training and supervision despite knowledge of the risk of constitutional violations occurring against C.M.

103.    LTISD has a custom of declining to enforce the board of trustee's policies or deferring mandatory disciplinary placements determined by the State Legislature. Such custom violates the rights of victims, such as C.M., and the custom is deliberately indifferent to C.M.'s rights.

104.    LTISD's custom, pattern, or practice demonstrates such an obvious need for more or different training such that LTISD could reasonably be said to have been deliberately indifferent to the need. LTISD ignored an obvious need to train and supervise employees on addressing peer bullying and harassment and the care of students with diagnosed food allergies at risk for anaphylaxis.

105.    As a direct and proximate result of LTISD's actions and omissions, C.M. has suffered damages including special and general damages according to proof.

## XI.    Sixth Cause of Action (LTISD)
### 42 U.S.C § 1983 Substantive Due Process

106.    Plaintiff repeats and re-alleges the allegations in previous paragraphs of this Complaint as if fully alleged herein.

107.    Acting under color of law, the administrator individuals, arbitrarily and capriciously failed to implement the mandatory provisions of the Student Code of Conduct and other policies designed to protect C.M.

108.     As a direct and proximate result of LTISD's actions and omissions, C.M. has suffered damages including special and general damages according to proof.

### XII.     <u>Seventh Cause of Action</u>
**(Norton, Garinger, Surdy, and Carter in their Individual Capacities)**
**42 U.S.C § 1983 Supervisor Liability**

109.     Plaintiff repeats and re-alleges the allegations in previous paragraphs of this Complaint as if fully alleged herein.

110.     Acting under color of law, the administrator individuals, Norton and Garinger, were responsible for failing to adequately train or supervise subordinates leading to violations against C.M.'s constitutional rights.

111.     Administrator Defendants failed to supervise administrators for which they were responsible and intentionally ignored state law requirements and LTISD policy on disciplining students who commit an assault.

112.     Administrator Defendants helped enforce LTISD's discriminatory policies or practices by depriving C.M. of an education that was appropriate for his disability; thereby, intentionally enabling and aiding the discrimination to continue against C.M. based on his disability by failing to supervise or train its subordinates.

113.     Further, Administrative Defendants ignored or irrationally applied the bullying policy as it pertained to students with disabilities.

114.     The inadequate training and supervision of administrators and staff resulted in a hostile educational environment for C.M. and the hostile environment was allowed to continue. There was an obvious need for training and supervision and the discrimination C.M. faced was a highly predictable consequence of not providing that training and supervision.

115.    The Administrative Defendants are liable to C.M. for excluding C.M. from activities, denying his benefits, and subjecting him to intentional discrimination.

## XIII.   ATTORNEYS' FEES

Pursuant to 29 U.S.C. § 794a(b), U.S.C.A. § 12205, and/or 42 U.S.C. §§ 1983, 1988, Plaintiffs are entitled to and seek an award of their reasonable attorneys' fees, costs, and expenses.

## XIV.   REMEDIES

Wherefore, C.M. respectfully requests that this Court accept jurisdiction, and based on the LTISD and the individual administrator defendants' violations of C.M.'s constitutional and civil rights, order LTISD to:

a)   modify its programs and activities so that LTISD stops engaging in unconstitutional and unlawful acts and to develop policies and procedures for ending any such unconstitutional and unlawful acts and the hostile and intolerant environment;

b)   implement mandatory and effective training programs for LTISD faculty, staff, and students on issues related to discrimination and methods to intervene to stop students from harassing other students based on disability status; and

c)   Adopt policies with specific guidelines for instructing teachers and administrators about how to address complaints by students who have been discriminated against because of their disability status.

C.M. further prays the Court enter judgment against the defendants for an amount of no less than $1,500,000.00, to compensate C.M. fully and fairly for the injuries and damages alleged herein; for interest and costs as allowed by law; for attorneys' fees; for equitable relief and for compensatory, special, and general damages and further relief that the Court deems just and proper.

## XV.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial for all issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays in the manner and particulars noted above, for the Court to enter a judgment against Defendants, jointly and severally, in an amount sufficient to fully compensate him for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, equitable relief requested and for its appeal if required, pursuant to Section 504, Title II of the ADA, the United States Constitution, and the common and state law, as well as the equitable issues noted above, and for other such relief that this Court may deem just and proper in law, equity, or both.

Respectfully submitted,

**SCHULMAN, LOPEZ,
HOFFER & ADELSTEIN, LLP**

Christopher H. Schulz
State Bar No. 24060576
Email: cschulz@slh-law.com
State Bar No. 24077349
Email: eangelone@slh-law.com
9011 Mountain Ridge Dr., Ste. 210,
Austin, Texas 78759
Telephone:     512-840-0022
Facsimile:     210-538-5384

**ATTORNEYS FOR PLAINTIFFS**